Filed 7/14/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re RAYMUNDO M., a Person Coming Under the Juvenile Court Law. | |
| | D076158 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. J242112) |
| RAYMUNDO M., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Browder A. Willis III, Judge. Affirmed.

Elisabeth R. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

After he raised a switchblade-like knife head-high and chased another minor while orally threatening him, Raymundo M. was charged in juvenile court with assault with a

deadly weapon (Pen. Code, § 245, subd. (a)(1)),[1] making a criminal threat (§ 422), and brandishing a weapon (§ 417, subd. (a)(1)), along with various enhancement allegations. The juvenile court found the charges and certain of the enhancement allegations true, declared Raymundo a ward of the court, and placed him with his mother under the supervision of the probation department.

On appeal, Raymundo contends (1) insufficient evidence supports the true finding on the assault count because he never got within striking distance of the victim or made stabbing or slashing motions with the knife; (2) the juvenile court failed to expressly declare whether it was treating the "wobbler" assault count as a felony or a misdemeanor, as required by Welfare and Institutions Code section 702; and (3) the court erred by imposing duplicative punishment on the criminal-threat and assault counts, in violation of section 654. For reasons we will explain, we reject these contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND[2]

In October 2018, I.S. was a 17-year-old high school senior. Raymundo did not attend the same high school, but he and I.S. had known each other since elementary school and had never had problems with each other.

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     Because Raymundo's appeal implicates the substantial evidence standard of review, we state the facts in the light most favorable to the juvenile court's disposition. (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448.)

One day during the school lunch break, Raymundo's younger brother (a freshman at I.S.'s high school) bumped into I.S., and the two got into an argument. Raymundo's brother apologized, and the incident seemed to blow over.

About one week later, I.S. and his younger brother (a freshman at the same high school) were walking to I.S.'s car a few blocks from campus after school. Raymundo, his brother, and two other males got out of a car and started "dogging" I.S. (i.e., staring aggressively at him). I.S. told his brother, "[Y]ou might want to run, because they're going to come after me." I.S. estimated Raymundo's group was about 21 feet away when the incident began. I.S.'s brother initially estimated on direct examination that the groups were 10-12 feet apart, but on cross-examination he estimated they were "about one house length" apart.

Raymundo asked I.S., "Can you help me with something?" I.S. saw that Raymundo was holding a knife about waist-high. The knife looked like a switchblade with the blade already exposed. Raymundo then raised the knife about head-high and began "lunging towards" and chasing I.S. I.S. was "in shock" and ran away; his brother stayed "frozen" in place. Raymundo and his group chased after I.S.

During the foot pursuit, Raymundo yelled, "Fuck Maza," which I.S. understood to be a gang reference, but it had no significance to I.S. because he was not involved with gangs. When Raymundo got within 10 feet of I.S., Raymundo told him, "You're going to die today." I.S. testified, "I just thought my life was going to end at that moment . . . [b]ecause [Raymundo] [was] was lunging at me with knives and everything."

3

I.S. believed Raymundo had the knife exposed throughout the chase, but I.S. acknowledged on cross-examination that he looked back a few times and did not see it.

At some point, Raymundo and his group abandoned their pursuit of I.S. I.S. returned to his school, calling 911 on the way. He told the dispatcher that four "gangsters" had gotten "out of a car, with blades," and were chasing him, but he "got away from 'em." The 911 call ended when I.S. found a campus security guard, who contacted the police. I.S. told the police Raymundo was the assailant.

Raymundo was charged with assault with a deadly weapon (§ 245, subd. (a)(1); hereafter, § 245(a)(1)), with serious felony and gang enhancement allegations (§§ 1192.7, subd. (c)(23), 186.22, subd. (b)(1)); making a criminal threat (§ 422), with serious felony and weapon-use enhancement allegations (§§ 1192.7, subd. (c)(23), 12022, subd. (b)(1)); and brandishing a weapon (§ 417, subd. (a)(1)), with a gang enhancement allegation (§ 186.22, subd. (d)). The juvenile court found the offense charges true; dismissed the gang enhancement allegations for a lack of evidence; and found the remaining enhancement allegations true. The court declared Raymundo a ward of the court, and placed him with his mother under the supervision of the probation department.

DISCUSSION

I. *Substantial Evidence of Assault With a Deadly Weapon*

To commit an assault with a deadly weapon when the weapon used is not inherently deadly, the perpetrator must use the " 'weapon . . . in such a manner as to be capable of producing and *likely to produce*, death or great bodily injury.' " (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029, italics added (*Aguilar*).) Raymundo

4

contends that because he was never within striking distance of I.S. and never made stabbing or slashing motions with the knife, insufficient evidence supports the juvenile court's finding that he used the knife in a manner likely to produce death or great bodily injury. We disagree. Substantial evidence supports the juvenile court's factual findings that Raymundo was within striking distance—or would have been, had I.S. not taken evasive action—and used the knife in a manner likely to produce death or great bodily injury.

## A. *Background*

At the close of the prosecution's evidence, Raymundo moved to dismiss the assault-with-a-deadly-weapon count on the basis the prosecution had not proven the charge beyond a reasonable doubt. Raymundo argued that because he merely raised a knife head-high from 21 feet away, he lacked the present ability to commit an assault and had not used the knife in a manner "likely to cause injury." Raymundo also argued that conflicting testimony "create[d] a reasonable doubt as to whether a weapon was even involved" at all.

The prosecutor countered that Raymundo completed the assault by "pulling out the knife, raising it up, and then starting [a] pursuit to close th[e] distance to presumably stab or hurt" I.S.

The court denied Raymundo's motion to dismiss. The court found I.S.'s "testimony credible . . . that there was a knife." The court further found there was an adequate evidentiary showing that "[a] knife is capable of causing harm," and was likely to do so because Raymundo raised it and ran toward I.S.

5

Moments later, in closing argument, the prosecutor distinguished Raymundo's assaultive conduct from his brandishing conduct. The prosecutor posited that if Raymundo had merely pulled a knife and stayed put, he would have committed only a brandishing offense. But by raising the knife and "trying to pursue [I.S.] and close th[e] distance," Raymundo converted a brandishing offense into an assault with a deadly weapon. The prosecutor emphasized that the law did not require I.S. to "wait . . . to actually get stabbed for" Raymundo to have committed an assault.

Raymundo's counsel argued that because I.S. acknowledged he saw the knife only at the beginning of the incident and not when looking back during the chase, Raymundo had not used the knife (if at all) in a manner likely to harm I.S.

The juvenile court found that the totality of circumstances—when viewed as a film "reel" and not as individual "snapshot[s]"—established that Raymundo had committed an assault with a deadly weapon. The court explained to Raymundo that he committed the assault by "stepp[ing] out of the vehicle, raising the hand, the victim taking off, [and] your giving chase . . . ." As to Raymundo's striking-distance theory, the court ruled that "[t]he law does not require that you actually close the distance or actually make contact"—it was "the totality of the act" in "attempting to close the distance and, in fact, closing the distance," that gave rise to liability.

## B. *Relevant Legal Principles*

### 1. *Assault*

The crime of assault with a deadly weapon has two components: "(1) the assault, and (2) the means by which the assault is committed." (*People v. Smith* (1997) 57

6

Cal.App.4th 1470, 1481; § 245 (a)(1) [defining the offense as "an assault upon the person of another with a deadly weapon or instrument other than a firearm"].)

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) A defendant has the " ' "present ability to injure" ' " " ' "[o]nce [he] has attained the means and location to strike immediately." ' " (*People v. Chance* (2008) 44 Cal.4th 1164, 1174 (*Chance*).) In this context, immediacy means that the defendant has "equip[ped] and position[ed] himself to carry out a battery . . . , even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Id*. at p. 1172.) Thus, an assault can occur even when the defendant makes no contact with the victim. (*Aguilar*, *supra*, 16 Cal.4th at p. 1028.)

For purposes of assault with a deadly weapon under section 245(a)(1), "a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury." (*Aguilar*, *supra*, 16 Cal.4th at pp. 1028-1029.) "Because a knife can be, and usually is, used for innocent purposes, it is not among the few objects that are inherently deadly weapons." (*People v. Aledamat* (2019) 8 Cal.5th 1, 6.) "In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of

7

the object, the manner in which it is used, and all other facts relevant to the issue." (*Aguilar*, at p. 1029.)

In *In re B.M.* (2018) 6 Cal.5th 528, the California Supreme Court clarified what it means for an object to be "used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." (*Id.* at pp. 532-536.) The minor in *In re B.M.* stabbed at her sister's blanket-covered legs using a butter knife. (*Id.* at p. 531.) The butter knife did not "pierce" the blanket or cause serious bodily injury to the sister. (*Id.* at pp. 531, 536.) On these facts, the Supreme Court found it "questionable" whether the knife was "*capable* of causing great bodily injury" (*id.* at p. 539, italics added), and that there was insufficient evidence to support that the minor's use of the knife was "*likely* to do so" (*ibid.*, italics added).

The *In re B.M.* court clarified the "likely to cause" prong in several respects. First, the prong "requires more than a *mere possibility* that serious injury could have resulted from the way the object was used." (*In re B.M.*, *supra*, 6 Cal.5th at p. 534, italics added.) Second, "the determination . . . must rest on evidence of how the defendant actually 'used' the object"—"conjecture" about the manner of use is impermissible. (*Ibid.*)[3] Third, "the extent of actual injury or lack of injury is also relevant" because it "may suggest that the nature of the object or the way it was used was not capable of producing or likely to

_____

3    Although this second factor prohibits consideration of how the defendant *could have used* the object, it allows consideration of "what harm *could have resulted* from the way the object was *actually used*." (*In re B.M.*, *supra*, 6 Cal.5th at p. 535, italics added.) That is, "the evidence may show that serious injury was likely, even if it did not come to pass." (*Ibid.*)

8

produce death or serious harm." (*Id*. at p. 535.) Finally, the court clarified that "an aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure or being removed from harm's way once an assault is already underway." (*Id.* at p. 537.)

Applying these principles, the *In re B.M*. court explained why insufficient evidence showed that the minor's use of the butter knife was likely to cause death or great bodily injury:  the butter knife was not sharp; the minor thrusted it only at her sister's blanket-covered legs and not more vulnerable body parts; the minor used such "moderate pressure" that the knife neither "pierced the blanket" nor "cause[d] serious bodily injury" to the sister; and the record did not support that the sister used the blanket defensively (rather, she had already covered her legs with it because she had just gotten out of the shower and was trying to cover herself). (*In re B.M*., *supra*, 6 Cal.5th at pp. 536-537.)

2. *Standard of Review*

Whether a perpetrator is within striking distance or uses an object in a manner that renders it a deadly weapon are questions for the trier of fact, the resolution of which we review for substantial evidence. (*People v. Nguyen* (2017) 12 Cal.App.5th 44, 49 (*Nguyen*) [striking distance]; *Aguilar*, *supra*, 16 Cal.4th at p. 1029 [nature of weapon].)

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]  We presume in support of the

9

judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890 (*Covarrubias*).)

## C. *Analysis*

Considering the record in the light most favorable to the juvenile court's factual findings, we conclude substantial evidence supports the true finding that Raymundo committed an assault with a deadly weapon.

I.S. testified Raymundo produced a knife that looked like a switchblade with the blade already exposed. The juvenile court found this testimony credible and reasonably inferred from the description of the knife that it was capable of causing harm. Raymundo raised the knife from waist-high to head-high, indicating he intended to use it in an offensive manner. Then, rather than merely brandish the knife while standing still, Raymundo lunged and ran toward I.S. from 10 to 12 feet away.[4] This evidence supports the reasonable finding that, but for I.S. fleeing in fear for his life, Raymundo actually

---

4        We accept I.S.'s brother's estimate of 10 to 12 feet because it is most favorable to the juvenile court's ruling. (*Covarrubias*, *supra*, 1 Cal.5th at p. 890.) We disregard Raymundo's assertion that the brother's "house-length" estimate was "most favorable to the People." It was, in fact, the *least* favorable.

10

used the knife in a way capable of producing, and likely to produce, death or great bodily injury—that is, as a deadly weapon.

The California Supreme Court upheld an assault conviction on substantially similar facts in *People v. Yslas* (1865) 27 Cal. 630 (*Yslas*).  As the high court more recently summarized its earlier *Yslas* decision, "In *Yslas*, the defendant approached within seven or eight feet of the victim with a raised hatchet, but the victim escaped injury by running to the next room and locking the door.  [The defendant] committed assault, even though he never closed the distance between himself and the victim, or swung the hatchet."  (*Chance*, *supra*, 44 Cal.4th at p. 1174.)  The *Yslas* court explained why the victim's evasive actions did not immunize the defendant's conduct:

> "It is not indispensable to the commission of an assault that the assailant should be at any time within striking distance.  If he is advancing with intent to strike his adversary and come sufficiently near to induce a man of ordinary firmness to believe, in view of all the circumstances, that he will instantly receive a blow unless he strike in self-defense or retreat, the assault is complete.  In such a case the attempt has been made coupled with a present ability to commit a violent injury within the meaning of the statute.  It cannot be said that the ability to do the act threatened is wanting because the act was in some manner prevented."  (*Yslas*, *supra*, 27 Cal. at p. 634.)

Like the defendant in *Yslas*, Raymundo approached I.S. with a raised weapon. (*Yslas*, *supra*, 27 Cal. at p. 631.)  And like the victim in *Yslas*, I.S. escaped injury only by retreating.  (*Ibid*.)  Thus, like the defendant in *Yslas*, Raymundo committed an assault with a deadly weapon "even though he never closed the distance between himself and [I.S.], or swung the [knife]."  (*Chance*, *supra*, 44 Cal.4th at p. 1174, citing *Yslas*, at pp. 631, 633-634.)

11

Raymundo suggests the 10 to 12 feet at issue here meaningfully distinguishes this case from the seven or eight feet at issue in *Yslas*. The Court of Appeal in *Nguyen*, *supra*, 12 Cal.App.5th 44 rejected essentially the same argument.[5] The *Nguyen* defendant argued that, *as a matter of law*, he could not have committed an assault with a deadly weapon because he was 10 to 15 feet away from police officers when he pointed a knife "in the[ir] direction . . . and took a step toward them." (*Id.* at pp. 46-47.) The Court of Appeal "decline[d] to distinguish, as a matter of law, a situation involving seven or eight feet of separation between the perpetrator and the victim, from that involving 10 or 15 feet," instead finding it was "a factual matter within the province of the trier of fact." (*Id.* at p. 49.)

We find the *Nguyen* court's reasoning persuasive. Thus, we likewise conclude it is "within the province of the trier of fact" (*Nguyen*, *supra*, 12 Cal.App.5th at p. 49) to determine whether a perpetrator is "advancing with intent to strike" from "sufficiently near to induce a man of ordinary firmness to believe, in view of all the circumstances, that he will instantly receive a blow unless he strike[s] in self-defense or retreat[s]" (*Yslas*, *supra*, 27 Cal. at p. 634). The 10- to 12-foot distance at issue here is within a range the trier of fact could reasonably conclude posed a danger of imminent bodily harm

---

5      The *Nguyen* court analyzed the striking-distance issue in the context of the "present ability" element of assault, rather than the "likely to produce" harm element. We view these elements as closely interrelated.

12

to I.S., absent evasive action. Thus, substantial evidence supports the juvenile court's rejection of Raymundo's striking-distance defense.[6]

Nor are we persuaded by Raymundo's contention that because he never made swinging or stabbing motions with the knife, he did not use it in a manner likely to cause death or great bodily injury. As noted, the courts have held that an assault with a deadly weapon can occur even when the defendant never swings the weapon. (See *Yslas*, *supra*, 27 Cal. at pp. 631, 633-634; *Chance*, *supra*, 44 Cal.4th at p. 1174; *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1168 (*Bernal*) [affirming conviction for assault with a deadly weapon where the defendant held up a knife to the victim and asked, " 'Do you want to do this?' "].)

Contrary to Raymundo's suggestion, simply because the juvenile in *In re B.M.*, *supra*, 6 Cal.5th 528 made stabbing motions with a butter knife (*id.* at p. 531), and the defendant in *People v. Koback* (2019) 36 Cal.App.5th 912 made swinging or swiping motions with the sharp end of a car key (*id.* at p. 918), does not mean that similar movements are required to establish an assault with a deadly weapon in every case.

---

6    Even accepting I.S.'s estimate of 21 feet, we would decline to determine as a matter of law that such a distance precluded the trier of fact from concluding Raymundo posed an imminent threat to I.S. (See, e.g., *Buchanan v. City of San Jose* (9th Cir. 2019) 782 Fed. Appx. 589, 592 ["The 21-foot rule provides that a person at a distance of 21 feet or less from an officer may pose a threat to the officer's safety."]; Minner, *Deadly Force in the Tenth Circuit* (2019) 43 Okla. City U. L.Rev. 171, 195 ["Many police officers are trained on the [21]-foot rule, which generally provides that a suspect with a knife within [21] feet of an officer can attack the officer before the officer can react and fire his or her weapon."].)

13

Moreover, because the butter knife and car key at issue in *In re B.M.* and *Koback*, respectively, are less conventionally weapon-like than the switchblade-like knife at issue here, those courts' extensive discussions about the specific manners in which those objects were used are less instructive here.

Finally, Raymundo's conduct is not excused merely because I.S. took evasive action that thwarted the assault. (*Yslas*, *supra*, 27 Cal. at p. 634 ["It cannot be said that the ability to do the act threatened is wanting because the act was in some manner prevented."]; *Chance*, *supra*, 44 Cal.4th at p. 1173 ["an assault may occur even when the infliction of injury is prevented by environmental conditions or by steps taken by victims to protect themselves"]; *Bernal*, *supra*, 42 Cal.App.5th at p. 1168 ["a jury could reasonably conclude that the [victim] would likely have been touched with the knife had he not moved out of the way"]; *In re B.M.*, *supra*, 6 Cal.5th at p. 537 ["an aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure or being removed from harm's way once an assault is already underway"].)

All things considered, substantial evidence supports the juvenile court's factual finding that, by lunging and running toward I.S. with a raised switchblade-like knife from a distance of 10 to 12 feet away, Raymundo used the knife in a manner that likely would have caused great bodily injury to I.S. had I.S. not taken evasive actions.

## II. *Express Declaration of Assault as a Felony*

Assault with a deadly weapon is a wobbler that can be treated in the court's discretion as a felony or a misdemeanor. (§§ 17, 245(a)(1); *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 907.) When a minor is found to have committed a wobbler, the

14

juvenile court "shall declare the offense to be a misdemeanor or felony." (Welf. & Inst. Code, § 702.) Raymundo contends the court failed to make this required declaration. We disagree. The record, as a whole, reflects the juvenile court understood the scope of its discretion and expressly declared the offense a felony.

A. *Background*

At the end of the adjudication hearing, the juvenile court made true findings as to all three offenses and the remaining (i.e., non-gang-related) enhancement allegations. In calculating Raymundo's maximum exposure, the court designated the assault the principal offense, the criminal threat the subordinate offense, and the brandishing count "absorbed in the assault" count under section 654. The court "also note[d] that the [criminal-threat count] is a wobbler; and based on that fact that it is a wobbler, the Court determines that the evidence supports that it is a felony." The court did not make similar oral findings regarding the assault count. The court's minute order for the adjudication hearing refers to each count as "a felony,"[7] and states that, "as to [the criminal-threat count], the court makes the findings pursuant to [Welfare and Institutions Code section] 702."

In advance of the disposition hearing, Raymundo filed a memorandum asking the court to "exercise its discretion under Penal Code § 17(b) and reduce Count 1 [assault with a deadly weapon] and Count 2 [criminal threat] of the petition to misdemeanors." Specifically, citing Welfare and Institutions Code section 702, Raymundo argued, "The

_____

[7] The court later clarified that brandishing is a misdemeanor.

15

court has the discretion to reduce the charges listed in Counts 1 and 2 to misdemeanors as they are both 'wobblers' . . . ."  Raymundo reasoned misdemeanor treatment was appropriate because he would otherwise be "straddle[d] . . . with two strike offenses" because the criminal threat (ordinarily not a strike) would be "transform[ed] into a strike for future purposes" because it was committed alongside the aggravated assault (a strike).

At the outset of the disposition hearing, the court told Raymundo, "[Y]our attorney has filed a disposition memorandum requesting that the court exercise its discretion and reduce the felony true findings to misdemeanors, so we will have that discussion . . . ."  During that discussion, Raymundo's counsel argued misdemeanor treatment was warranted because, "in the grand scheme of things, considering the circumstances of this offense, I don't think it rises to the level . . . where it ultimately ends up strapping Raymundo with two strikes for the rest of his life."

The prosecutor was "opposed to reducing both of the indicated counts to misdemeanors" because, "[i]n looking at the facts of this case," Raymundo engaged in conduct that "elevate[d] the situation, by having the knife there, by chasing the victim, by telling the victim that, 'You're going to die today.'  [¶]  This is felony conduct . . . ."  However, the prosecutor acknowledged that if the court were to reduce the aggravated assault count to a misdemeanor, "then the [criminal threat] will automatically no longer be a strike."

The court stated it was "wrestling with the request" to reduce the offenses to misdemeanors.  On one hand, the court found it "an almost absurd result" that Raymundo could receive an "incredibly disproportionate . . . two-strike finding" due to "a quirk in

16

the law."  But on the other hand, the court said, "I[] . . . still have the reality of what went down on my mind.  [¶]  *I found it to be a felony*, so if the Court makes this reduction in the future, it's more along the lines of an equitable consideration, which I'm willing to make, but not today."  (Italics added.)

The court deferred ruling and set "a six-month review to specifically address the issue of the reduction."  After advising Raymundo that unsatisfactory performance on probation could result in a commitment to a state facility, the court ended the hearing on an optimistic note:  "Hopefully the only conversation that we have is the one . . . about your performance over the next six months, how you're doing.  I will make a ruling as to the request to reduce."

### B.  *Relevant Legal Principles*

Welfare and Institutions Code section 702 states in part:  "If the minor is found to have committed an offense which would in the case of an adult be punishable alternatively as a felony or a misdemeanor, the court shall declare the offense to be a misdemeanor or felony."  The court is required to make an "explicit declaration" whether a wobbler offense is a felony or a misdemeanor.  (*In re Manzy W*. (1997) 14 Cal.4th 1199, 1204; Cal. Rules of Court, rule 5.780(e)(5) ["the court must . . . expressly declare on the record that it has made such consideration, and must state its determination as to whether the offense is a misdemeanor or a felony"].)  This rule ensures that the juvenile court is aware of—and actually exercises—its discretion to treat the offense as a felony or a misdemeanor.  (*In re Manzy W*., at p. 1207.)  If the court did not make the required express determination, but the record shows it was aware of—and, in fact, exercised—its

17

discretion, the matter need not be remanded. (*Id*. at p. 1209.) However, if the record does not show such an exercise of discretion, the matter must be remanded. (*Ibid*.)

C. *Analysis*

Based on our review of the record as a whole, we conclude the juvenile court made the informed declaration required by Welfare and Institutions Code section 702.

First, the juvenile court expressly declared the aggravated assault a felony at the disposition hearing. In weighing Raymundo's request to reduce the assault and criminal-threat offenses to misdemeanors, the court expressly stated, "*I found it to be a felony*." (Italics added.) This statement immediately follows the court's reference to "the reality of what went down," which we construe as referring to the entire incident (and not, as Raymundo suggests, only the criminal threat).

Additional context supports our interpretation. The petition alleged the assault count as a felony and included a serious felony enhancement allegation. The minute order documenting the adjudication hearing expressly referred to the offense as "a felony." And the court treated the offense as a felony for purposes of calculating Raymundo's maximum exposure by designating it the principal offense. Although none of these factors is sufficient on its own to satisfy Welfare and Institutions Code section 702's express declaration requirement, they are nonetheless helpful in construing the juvenile court's express oral declaration at the disposition hearing.

Second, the record shows the court was aware that aggravated assault is a wobbler and that the court had the discretion to treat it as either a felony or misdemeanor. To begin with, Raymundo explicitly told this to the court in his disposition memorandum.

18

And we know the court read the memorandum because the court described it to Raymundo at the outset of the disposition hearing. The court's description to Raymundo expressly referenced the "court[']s . . . discretion [to] reduce the felony true findings to misdemeanors." The court also heard extensive argument from counsel on the issue and deferred ruling, indicating the court would revisit the reduction request in six months.

Even more fundamentally, the fact the court was considering reducing the assault count to a misdemeanor *at all* reflects the court's understanding that the offense was a wobbler. This is because courts do not have the authority to reduce straight felonies to misdemeanors; courts can only reduce wobblers. (See *Sannmann v. Department of Justice* (2020) 47 Cal.App.5th 676, 683.)

Raymundo argues that because the court's consideration of the wobbler issue arose in response to his motion to reduce the offense under section 17, and not spontaneously under Welfare and Institutions Code section 702, the court was not fully aware of its discretion because "under [section] 17[, subdivision] (b), the court exercises leniency, while under [Welfare and Institutions Code section] 702, a court must actually *adjudicate* whether the evidence reflects a misdemeanor." (Italics added.) But while Raymundo supports this argument with citations to the standard governing section 17 reductions, he cites no authorities supporting his argument that a different standard applies to the "adjudication" he contends is required by Welfare and Institutions Code section 702. Indeed, that statute says nothing about an *adjudication*—or a *determination* or any other *deliberative* action—it requires only a *declaration.* Absent any authority that the court's awareness of its discretion under section 17 is an insufficient basis to make an informed

19

*declaration* under Welfare and Institutions Code section 702, Raymundo has not met his burden of showing error.

### III. *Section 654*

For his final challenge, Raymundo contends the juvenile court erred by failing to stay punishment under section 654 on his criminal-threat count as impermissibly duplicative of his punishment on the assault count.[8] We are not persuaded.

Section 654 "generally precludes multiple punishments for *a single physical act* that violates different provisions of law [citation] as well as multiple punishments for an *indivisible course of conduct* that violates more than one criminal statute." (*People v. Newman* (2015) 238 Cal.App.4th 103, 111-112; *People v. Rodriguez* (2009) 47 Cal.4th 501, 507.)[9] " 'Whether *a course of criminal conduct* is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*Rodriguez*, at p. 507.) "If, on the other hand, '[the defendant] entertained multiple criminal

---

[8] Although Raymundo did not raise this argument in the juvenile court, "[e]rrors in the applicability of section 654 are corrected on appeal regardless of whether the point was raised by objection in the trial court or assigned as error on appeal." (*People v. Hester* (2000) 22 Cal.4th 290, 295.)

[9] Section 654 provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, *but in no case shall the act or omission be punished under more than one provision*." (Italics added.)

objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Martin* (2005) 133 Cal.App.4th 776, 781; see *People v. Leonard* (2014) 228 Cal.App.4th 465, 499 (*Leonard*).)

"In the absence of any reference to . . . section 654 during sentencing, the fact that the court did not stay the sentence on any count is generally deemed to reflect an implicit determination that each crime had a separate objective." (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618; see *Leonard*, *supra*, 228 Cal.App.4th at p. 499.)

Substantial evidence supports the juvenile court's implicit finding that Raymundo acted with separate objectives when he assaulted and then threatened I.S. That is, the court could reasonably have found that Raymundo committed the assault with the objective of inflicting *physical* harm on I.S., whereas Raymundo criminally threatened I.S. with the separate objective of inflicting *mental or emotional* harm. Courts routinely recognize similar distinctions. (See, e.g., *People v. Mejia* (2017) 9 Cal.App.5th 1036, 1047 ["a reasonable trier of fact could conclude that the criminal threats were in furtherance of a separate criminal objective" of "mentally or emotionally terrorizing the victim," whereas the objective in committing torture was "the intent to cause extreme physical pain"]; *People v. Solis* (2001) 90 Cal.App.4th 1002, 1022 (*Solis*) [defendant who

21

made criminal threats and attempted to burn down victim's house "had distinct objectives: in making the [criminal] threats, the defendant intended to frighten whereas in committing arson an hour later the defendant intended to burn"]; *People v. Louie* (2012) 203 Cal.App.4th 388, 398 ["There was sufficient evidence to support a finding by the trial court that defendants harbored multiple independent objectives when they threatened [the victim], then set her apartment on fire."]; *People v. Phan* (1993) 14 Cal.App.4th 1453, 1466 ["the robbery of [K.D.] and the threat to cut off the hand of her 8-year-old son . . . were *separate* and divisible acts"]; *People v. Tom* (2018) 22 Cal.App.5th 250, 261 ["The court reasonably could have concluded that in strangling [the dog], defendant intended to kill the dog, and that in putting oil on [the dog]'s body and attempting to light it on fire, defendant intended to burn the evidence that he had killed the dog thereby avoiding detection of his crime."].)

Raymundo misplaces his reliance on *People v. Mendoza* (1997) 59 Cal.App.4th 1333, in which the Court of Appeal concluded the trial court erred by imposing separate punishments for making a criminal threat and dissuading a witness. But in *Mendoza*, "[t]he parties agree[d] [the defendant]'s two convictions *arose from a single act*" (*id.* at p. 1346, italics added), whereas Raymundo's assault and criminal-threat counts arose from separate conduct that the juvenile court could reasonably have concluded were undertaken pursuant to separate objectives. (See *Solis*, *supra*, 90 Cal.App.4th at p. 1022 [finding *Mendoza* "clearly distinguishable" because "the same conduct formed the factual basis of both convictions"].)

Accordingly, the juvenile court did not err in implicitly concluding section 654 did not apply.

DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


GUERRERO, J.

23